IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re | ) BANKRUPTCY APPEAL )|
| NATIONAL STEEL CORPORATION, et al., | ) ) ) ) No. 06 C 2740 |
| Reorganized Debtors. | ) ) ) |
| NSC CREDITOR TRUST | ) ) Bankruptcy Case No. 02 B 8699 |
| Plaintiff-Appellant, | ) ) Adversary Proc. No. 04 A 1322 |
| v. | ) ) ) |
| BSI ALLOYS, INC., | ) ) ) |
| Defendant-Appellee. | ) ) |

## MEMORANDUM OPINION AND ORDER

This is an appeal of a bankruptcy preference action brought under 11 U.S.C.A. § 547 (2004).[1] Plaintiff-Appellant NSC Creditor Trust (the "Trust") appeals the orders of the Bankruptcy Court for the Northern District of Illinois ("bankruptcy court") denying its motion for partial summary judgment and granting Defendant-Appellee BSI Alloys, Inc.'s ("BSI") motion for summary judgment. At issue in both motions was whether BSI met its burden to show that three preferential payments it received from reorganized debtor National Steel Corporation ("NSC") were made in the ordinary course of

---

[1]This action was filed before certain 2005 amendments changed § 547(c), so this opinion references the 2004 version of the United States Code, which the parties agree governs this action.

business and accordingly were not avoidable transfers under § 547. The bankruptcy court concluded that BSI met this burden, and the Trust contests this finding. On appeal, I review the bankruptcy court's conclusions of law *de novo*. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996). Because the bankruptcy court did not make any factual findings in ruling on the parties' cross-motions for summary judgment, I must consider the cross-motions *de novo*. *See Hoseman v. Weinschneider*, 322 F.3d 468, 473 (7th Cir. 2003). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits filed, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). For the following reasons, I affirm the bankruptcy court's denial of partial summary judgment for the Trust, but reverse its grant of summary judgment for BSI, and remand this case back to the bankruptcy court for further proceedings.

I.

From the parties' pleadings, the following set of facts emerges: NSC was an integrated steelmaker, and BSI provided NSC with High Carbon Ferromanganese ("manganese") to use in its steel manufacturing. BSI provided this product to NSC on credit, issuing invoices to NSC for payment of the already-delivered manganese.

2

Prior to January of 2002, all invoices that BSI submitted to NSC were paid under a payment agreement referred to as "Prox 25." Prox 25 generally required NSC to pay each invoice on the 25th day of the month following the date of the invoice (or, if the 25th fell on a weekend or holiday, the next business day after the 25th). The parties disagree whether these terms were strictly observed; a BSI witness testified that BSI considered a payment to be made within the Prox 25 terms so long as the payment was received "approximately" within 14 days of the 25th, regardless of when the check paying the invoice was actually issued. However, NSC's director of corporate accounting provided an affidavit stating that Prox 25 procedures required payments to be made on the 25th of each month, and the Trust argues this required NSC to issue a check on that date.

NSC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 6, 2002. Under Chapter 11, the trustee of a debtor can avoid certain transfers of the debtor's property made within 90 days of the filing of a petition for relief. 11 U.S.C.A. § 547. For NSC, the relevant avoidance period is between December 6, 2001 and March 5, 2002 (the "Preference Period"). For the 22 months prior to the Preference Period, NSC made one payment per month to BSI (with the exception of April 2000), with each payment potentially paying multiple invoices. NSC

made these payments through checks that it issued and mailed to BSI on or about the 25th day of each month. The parties do not dispute that these checks typically had a lag in mail and processing time and were usually received by BSI between the first and tenth day of the following month. The parties also agree that while most checks in the past were sent by regular mail, some were sent by overnight mail at the direction of NSC's treasury department.

During the Preference Period, NSC paid additional invoices from BSI via four separate checks referred to by both parties as the "First, Second, Third and Fourth Transfers." The parties do not dispute that the First Transfer was in the ordinary course of business and therefore not a transfer that the trustee can avoid, but contest whether the remaining three transfers were in the ordinary course of business.

NSC made the Second Transfer through a check dated February 4, 2002, that BSI received on February 5, 2002. The Second Transfer paid invoices dated December 5, December 7, December 11, December 13, and two invoices dated December 27, 2001.[2] The parties disagree whether this transfer satisfied the terms of the Prox 25 agreement because they dispute what those terms were, but they agree that NSC delivered this check to BSI within the time frame BSI had normally received payments from NSC.

---

[2]At the time the check was issued these invoices were outstanding 62, 60, 56, 54 and 40 days respectively.

After the Second Transfer, NSC and BSI changed their payment terms to a new payment procedure referred to as "Net 30." NSC and BSI negotiated this change in a series of letters and telephone calls in December of 2001 and January of 2002. On December 13, 2001, BSI sent NSC a letter proposing the new payment plan and requesting that each purchase order include the following sentence: "[NSC] represents to [BSI] that [NSC] is currently able to pay its debts as they come due, and will be able to pay its debts, including the obligation represented by this order, on the due date." On January 2, 2002, BSI sent NSC another letter stating, "Per our offer of 12/13/01, and our subsequent telephone conversations, we will invoice at net 30-day terms, with a 2.5% discount. Checks to be paid via U.S. Mail, but will be monitored by both sides! Should payments slip, BSI will require payment via wire transfer."

It appears that the Net 30 agreement went into effect for invoices beginning January 7, 2002, but the parties agree that the Third and Fourth Transfers were governed by the terms of the Net 30 agreement even though one invoice paid on the Third Transfer was issued before January 7. The Trust claims that under the Net 30 agreement NSC was required to pay each invoice from BSI within 30

5

days of issuance.³ BSI contends that BSI and the steel industry understood Net 30 to require receipt of a check "approximately 40 days from the time of invoice" to allow time for issuance and delivery of the check.⁴ In exchange for an agreement to the shorter payment time, BSI gave NSC a 2.5% discount, which was an increase over the 2% discount in their previous contract.⁵ The Trust has presented evidence that NSC had Net 30 payment terms with fewer than 10% of its vendors. The Trust also presented a copy of a June 30, 1999 memorandum from NSC's Senior Vice President and Chief Financial Officer stating that

> [NSC] has established standard payment terms to maximize the efficiency of cash management and maintain a quality system with respect to internal accounting control.

---

³BSI points to testimony from NSC's representative that, under the Net 30 system, NSC issued checks from the regular check run that occurred closest to the expiration of the 30 day period, and also to testimony in which he agreed that "regular payments under net 30 could slip beyond 30 days." However, that representative also issued a supplemental affidavit in which he stated that NSC issued checks on the 25th day of the month or on Thursdays of weeks that did not include the 25th. For this reason, he stated that NSC paid invoices under the Net 30 agreement "between 24 and 30 days of the invoice date." What the NSC representative meant in his deposition testimony about payments potentially slipping beyond 30 days is a question for a finder of fact to resolve.

⁴The Trust contends that BSI "offers nothing to support that NSC knew of this subjective 'understanding' or that NSC was required to pay BSI pursuant to this subjective 'understanding.'"

⁵The parties dispute whether this increased discount actually offset the effect of the decreased payment time.

> Invoices dated in the current month will be paid on the 25th of the following month ("25th prox") provided that materials have been received and/or services have been rendered as of the invoice date.
>
> All payments made outside of 25th prox shall be approved by the Treasurer, Vice President or Director of Strategic Sourcing and the division Controller (if applicable) through a "Vendor Payment Terms Exception Form." The Treasurer, Vice President or Director of Strategic Sourcing and the Division Controller should review these exception forms on an annual basis for continuing applicability.

The parties have not presented evidence that explains whether this policy was in force at the time NSC changed its payment terms with BSI and, if it was, whether this procedure was followed in changing payment terms.

The new Net 30 agreement was in place for the Third and Fourth Transfers, but because the parties dispute what the precise terms of the Net 30 agreement were, they also dispute whether the Third and Fourth Transfers satisfied the terms of the Net 30 agreement. NSC made the Third Transfer to pay invoices from January 3, January 10, and January 15, 2002.[6] The Third Transfer came via a check dated February 14, 2002 that BSI received on February 20, 2002. NSC made the Fourth Transfer to pay invoices from January 17 and

---

[6]These invoices were outstanding 42, 35 and 30 days, respectively and were paid by a check issued 11 days earlier than it would have been under the Prox 25 agreement (or 20 days earlier, accepting BSI's contention that under the Prox 25 agreement it did not care when the check was issued as long as BSI received it within 14 days after the 25th day of the month).

7

January 22.[7] The Fourth Transfer came via a check dated February 22, 2002, that BSI received on February 26, 2002.[8]

The parties agree that the average number of days from BSI issuing an invoice to receiving a check from NSC in the 22 months before the Preference Period was 45.64, with the time between invoice and check receipt ranging anywhere from 21 to 68 days. The parties also agree that during the Preference Period, the average number of days from invoice to check receipt was 46.65 days, with the time between invoice and check receipt ranging anywhere from 35 to 62 days.

On March 6, 2002, NSC and related entities filed voluntary petitions for Chapter 11 relief. After the bankruptcy court approved NSC's reorganization plan, NSC's right to sue on certain

---

[7]These invoices were outstanding 36 and 31 days, respectively, and were paid by a check issued three days earlier than it would have been under the Prox 25 agreement (or, under BSI's argument about the Prox 25 requirements, 14 days earlier).

[8]The same day that the check representing the Third Transfer was issued (February 14, 2002), BSI sent NSC a letter stating that

> BSI has made the decision that we must change the payment terms for sales of [manganese] to [NSC]. . . . Therefore, we are changing the payment terms from net 30 days to 1%-15 days effective Monday, February 18, 2002. . . . We also need to ensure that there are no overdue receivables prior to new shipments being made. . . . We think the only way to manage this is to have payments made via wire transfer.

There is no dispute that the terms of this letter did not govern the Third or Fourth Transfer.

8

avoidance actions, including the one at issue here, was transferred to the Trust. The Trust then brought the present complaint against BSI seeking to avoid transfers NSC made to BSI within the Preference Period, seeking to recover those transfers, and seeking to disallow any claims BSI might have in NSC's bankruptcy action. The Trust moved for partial summary judgment, seeking, in relevant part, an order that the Second, Third and Fourth Transfers are avoidable transfers under 11 U.S.C.A. § 547(b) and therefore were not made in the ordinary course of business under § 547(c). BSI in turn moved for summary judgment on the Trust's complaint. In a memorandum opinion, the bankruptcy court denied the Trust's motion for partial summary judgment and granted BSI's motion for summary judgment, finding that the transfers at issue were in the ordinary course of business and therefore could not be avoided by the Trust. This appeal followed.

II.

This case is a Chapter 11 bankruptcy preference action under 11 U.S.C.A. § 547. Under § 547, the trustee of a debtor can avoid transfers of the debtor's property made within 90 days of the filing of a petition for relief if those transfers meet certain conditions set forth in § 547(b), and if the transferee cannot establish any of the defenses set forth in § 547(c). For purposes of the parties' cross-motions for summary judgment, the parties

stipulate that the Trust has satisfied its *prima facie* case to avoid the Transfers under § 547(b). The Trust has also stipulated for purposes of summary judgment that BSI has a valid ordinary course of business defense for the First Transfer. The only question for summary judgment, then, is whether BSI can establish an "ordinary course of business defense" as provided by § 547(c)(2) for the Second, Third and Fourth Transfers.

Section 547(c)(2) provides that a trustee may not avoid a transfer to the extent that the transfer was

- (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

- (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

- (C) made according to ordinary business terms.

11 U.S.C.A. § 547(c)(2).

The parties further stipulate for purposes of summary judgment that the requirements of subsections (A) and (C) have been met in this case. Therefore, I only need determine whether the Transfers from NSC to BSI were "made in the ordinary course of business or financial affairs of [NSC] and [BSI]." 11 U.S.C.A. § 547(c)(2)(B).

The Seventh Circuit has addressed this prong of the ordinary course of business defense on several occasions, most recently in *Kleven v. Household Bank F.S.B.*, 334 F.3d 638 (7th Cir. 2003). In

10

*Kleven*, the Seventh Circuit held that the ordinary course of business defense was designed to "leave undisturbed normal commercial and financial relationships and protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of both the debtor and the debtor's transferee." *Id.* at 642 (quoting *Meeks v. Harrah's Tunica Corp. (In re Armstrong)*, 231 B.R. 723, 729 (Bankr. E.D. Ark. 1999), *aff'd*, 260 B.R. 454 (E.D. Ark. 2001)). Citing an earlier Seventh Circuit opinion, the court in *Kleven* provided the following non-exhaustive list of factors to consider in evaluating whether a transaction satisfies § 547(c)(2)(B):

>   (1) the length of time the parties were engaged in the transaction at issue;
>
>   (2) whether the amount or form of tender differed from past practices;
>
>   (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and
>
>   (4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Id.* at 642 (citing *Barber v. Golden Seed Co.*, 129 F.3d 382, 390 (7th Cir. 1997)). These elements illustrate that a court's focus should be on "the specific relationship between the parties and the particular course of dealing between the parties." *Barber*, 129 F.3d at 390. The specific relationship between the parties can be determined by looking at their specific contractual agreement, but

it is possible for the parties to deviate from their written contract and still act within the ordinary course of their business dealings so long as the parties had acted outside of their contract. *See, e.g., In re Xonics Imaging Inc.*, 837 F.2d 763, 766-67 (7th Cir. 1988); *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993) (explaining that where the requirements of subsections (A) and (B) are met, "a 'late' payment isn't really late if the parties have established a practice that deviates from the strict terms of their written contract").[9] It is BSI's burden to prove that the payments NSC made to it meet the requirements of § 547(c)(2)(B). 11 U.S.C.A. § 547(g).

---

[9] BSI devotes a large section of its brief to the contention that the Supreme Court held in *Barnhill v. Johnson*, 503 U.S. 393, 402 n.9 (1992) that, according to BSI, "the relevant time period for comparison [in determining 'ordinariness'] is the period starting from when the goods were sold to NSC on credit (i.e., the invoice date) and ending when BSI received the check." This is a misreading of *Barnhill*. The Supreme Court in *Barnhill* addressed what the time of payment was for a transfer under § 547(b). The Supreme Court addressed this issue by analyzing statutory history relating to an older and now superceded version of § 547(c) in which a payment was determined to be in the ordinary course of business if it was made "within 45 days of when the underlying debt was first incurred." *Id.* The Supreme Court specifically noted that this requirement has now been eliminated from § 547(c) and that therefore "there is now less need to precisely date the time when a check transfer occurs for purposes of § 547(c)(2). That is, rather than inquiring whether a transfer occurred on the 45th day or the 46th, courts now need only focus on whether the transfer was made in the ordinary course of business." *Id.* (citing *Union Bank v. Wolas*, 502 U.S. 151, 162 (1991)). *Barnhill* makes clear that "ordinariness" encompasses much more than whether a check was received by the creditor within the usual time frame.

Whether a party has established an ordinary course of business defense is a mixed question of law and fact. "The standards created to define and interpret the phrase 'ordinary course of business' involve questions of law." *Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods)*, 186 B.R. 414, 421 (N.D. Ill. 1995) (addressing an analogous "ordinary course of business" defense under a different bankruptcy statute). However, what transpired between the parties both in the ordinary course of their business relationship and in the transactions at issue is a question of fact. *See id.* at 422 (citing cases and explaining that review of bankruptcy judge's findings with respect to what transpired are findings of fact subject to clear error review).

With this law in mind, I examine each of the Transfers at issue.

### III. The Second Transfer

I find that there is a dispute of material fact whether the Second Transfer was made in the ordinary course of business of BSI and NSC. The Second Transfer paid invoices for manganese as part of a long-standing business relationship between BSI and NSC that extended well before the Preference Period. NSC paid BSI with a check that was dated February 4 and received by BSI on February 5, 2002. Relying on the factors set forth in *Kleven*, the Trust argues that this Transfer was not in the ordinary course of business for

13

NSC because the check was issued ten days later than allowed under the Prox 25 agreement (and ten days later than was NSC's normal practice of paying invoices on the 25th day of every month).[10] See Kleven, 334 F.3d at 642. BSI has presented evidence that the date of a check did not concern it as long as it received the check within fourteen days of the 25th, although BSI has not contradicted the NSC employee testimony, relied on by the Trust, that NSC believed the Prox 25 agreement required it to issue checks on the 25th.

It is not clear from the evidence presented whether Prox 25 allowed NSC to write checks later than the 25th; this is a disputed material fact. Neither side has disputed what the understanding of the other side was, but this does not resolve the key question of what the agreement between NSC and BSI actually provided. If Prox 25 does not allow such a payment, then it would be extraordinary for this Transfer to be the sole payment in 22 months that was written late. See In re Xonics Imaging, Inc., 837 F.2d at 767 ("We hold that the conduct of the debtor, after becoming insolvent, in failing to make payments within the time required by his contract with the creditor is presumptively nonordinary.").

---

[10]The fact that the Second Transfer was made via overnight delivery is not, by itself, a concern. What suggests that the Transfer is not ordinary is that NSC, in seeking to have the check arrive by February 5, had to overnight the check because it only wrote the check on February 4.

14

Further, the Trust contends that the Second Transfer was only made in light of the letters sent on December 13, 2001 and January 2, 2002, in which BSI proposed changing to a Net 30 payment plan and in which BSI requested NSC affirm that it was able to pay outstanding invoices.[11] These letters primarily concern the re-negotiation of NSC and BSI's annual contract and are therefore not egregious "unusual collection or payment activity" *per se*. They do contain some unusual requests, including that NSC's PO state that NSC "is currently able to pay its debts as they come due, and will be able to pay its debts," that terms were subject to monthly review by BSI's credit department, that both NSC and BSI should monitor checks, and that BSI might change payment terms if payments "slip." None of these terms appear to have been the subject of negotiations for the previous year. BSI contends that these letters are irrelevant because NSC did not actually agree to some

---

[11]BSI's main argument supporting the ordinariness of all the Transfers at issue in this case is that the number of days between the issuance of an invoice and the receipt of a check by BSI was substantially similar both before and during the Preference Period. BSI's motion papers contain a chart illustrating this point. While this information is useful in evaluating the ordinariness of the payments, I agree with the Trust that it is not dispositive. *See, e.g., Paloian v. Quad-Tech, Inc. (In re GGSI Liquidation, Inc.)*, 313 B.R. 770, 775-76 (Bankr. N.D. Ill. 2004) (noting that a "mechanical analysis" of payments is "unconvincing" where parties did not have a consistent payment practice). Other factors besides a similarity between the aggregate average amount of time payments were received before and during the Preference Period is required in order to determine whether a transfer was made in the ordinary course of business. The test articulated in *Kleven* makes that clear. *See* 334 F.3d at 642.

15

of these terms, including the wording on the NSC PO, but this does not mean that the letters did not exert pressure on NSC to pay outstanding invoices to BSI and, ultimately, to agree to a shorter payment period as discussed with respect to the Third and Fourth Transfers. Because there is a dispute of material fact about what the Prox 25 agreement required, summary judgment is inappropriate for either BSI or the Trust at this stage, and I overturn the bankruptcy court's order granting summary judgment to BSI.

## IV. The Third and Fourth Transfers

I also find that there is a dispute of material fact that precludes summary judgment on whether the Third and Fourth Transfers were within the ordinary course of business. This dispute centers on what the new Net 30 terms required, the reasons for entering into the Net 30 agreement, and the timing of the payments under the Third and Fourth Transfers.

First, the parties have a clear dispute about the content of BSI and NSC's agreement on the Net 30 payment terms. The Trust contends that NSC was required to pay each invoice to BSI within 30 days of issuance, and points out that under this understanding, the majority of invoices paid by the Third and Fourth Transfers were late. BSI contends that BSI and the steel industry understood Net 30 to require receipt of a check "approximately 40 days from the time of invoice" to allow time for issuance and delivery of the

16

check.[12] Although the Trust contends that BSI has not shown any evidence that NSC shared BSI's understanding, BSI's argument is implicit. If BSI and the steel industry generally had a different understanding, a finder of fact could reasonably believe that NSC had a similar understanding. As the Seventh Circuit has stated, a late payment where the parties did not have a practice of allowing late payments is presumptively nonordinary. *See In re Xonics Imaging, Inc.*, 837 F.2d at 767.

In addition, there is the question of why NSC and BSI switched to payment terms that shortened the length of payment times. The parties agree that NSC and BSI mutually agreed to the Net 30 terms, but given the tone of BSI's letters it cannot be said that BSI did not exert pressure on NSC to agree to stricter payment terms. The record is simply devoid of facts about the negotiations and how the new agreement was reached. The Trust does note, however, that NSC had Net 30 terms with fewer than 10% of its vendors, suggesting that this was not an ordinary agreement for it.

Furthermore, the same day that the check representing the Third Transfer was issued, and a week before the check representing the Fourth Transfer was issued, BSI sent NSC a letter stating that BSI was unilaterally changing payment terms from Net 30 to "1%-15 days" and that it would now "ensure that there are no overdue

---

[12] The Trust contends that BSI "offers nothing to support that NSC knew of this subjective 'understanding' or that NSC was required to pay BSI pursuant to this subjective 'understanding.'"

17

receivables prior to new shipments being made." While these payment terms were not in force for either the Third or Fourth Transfers, it is impossible to say that this were not "unusual collection activity" or that BSI did not take advantage of NSC's financial difficulties, two of the factors articulated in *Kleven*. 334 F.3d at 642. The parties have not explained whether this letter was received by NSC before or after it issued the check for the Third Transfer, so it is possible that this letter had no bearing on that Transfer, but a reasonable finder of fact could concluded that this letter influenced NSC to make the Fourth Transfer. Therefore, summary judgment on the character of the Third and Fourth Transfers is inappropriate for either party at this time.[13]

V.

In *Kleven*, the Seventh Circuit explained that the § 547(c)(2) was intended to protect "recurring, customary credit transactions which are incurred and paid in the ordinary course of business of both the debtor and the debtor's transferee." 334 F.3d at 642. Here, there is a dispute of material fact about what the "customary" transaction between BSI and NSC was as dictated by

---

[13] In support of its argument that it did not engage in extraordinary collection practices, BSI cites a series of cases from this and other jurisdictions in which particular activities were held to be extraordinary. However, these cases do not rule out a finding that BSI's collection practices in this case were extraordinary or that, at the least, BSI took advantage of NSC's financial difficulties. *See Kleven*, 334 F.3d at 642.

their contractual agreement with one another. For this reason, and as explained above, summary judgment for either party is inappropriate at this time. I therefore affirm the order of the bankruptcy court denying partial summary judgment for the Trust, but reverse the bankruptcy court's order granting summary judgment for BSI. This case is remanded back to the bankruptcy court for proceedings consistent with this opinion.

**ENTER ORDER:**

*Elaine E. Bucklo*
───────────────────────
**Elaine E. Bucklo**
United States District Judge

DATED: September 27, 2006